IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHRISTOPHER DON BLOUNT                                                    PLAINTIFF

        v.                Civil No. 07-5046

SGT. ECHOLS; PVT. CARLTON;
LT. CARTER; and CAPTAIN
HUNTER PETRAY, all of the
Benton County Detention Center                                             DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*. Plaintiff maintains his constitutional rights were violated while he was incarcerated at the Benton County Detention Center. First, he contends First Amendment rights to the free exercise of religion were denied when he was prohibited from having his Bible, his Book of Mormon, and other religious texts. Second, he maintains excessive force was used against him by Sgt. Echols and Pvt. Carlton. Third, he contends his rights were violated when Captain Petray interrogated him about filing a lawsuit and questioned him about contacting the Judicial Committee. We will interpret this claim as a retaliation claim.

Defendants filed a summary judgment motion (Doc. 14). To assist plaintiff in responding to the summary judgment motion, a questionnaire was propounded (Doc. 18). Plaintiff sought (Doc. 19) and was given an extension of time until August 27th to file a response to the questionnaire (Doc. 20). On August 29th, a partial response to the questionnaire was received (Doc. 21). The response begins at page nine of the questionnaire with the response to question sixteen.

-1-

AO72A
(Rev. 8/82)

## Background

Blount was booked into the Benton County Detention Center (BCDC) on August 17, 2006, on violations of the Arkansas Hot Check Law and a failure to appear charge. *Defendants' Exhibit* 1 at pages 1-2 (hereinafter *Defts' Ex.*). He was given a copy of the Benton County Inmate Rights which states that each inmate is to be provided freedom of religion, including the exercise of religious beliefs, so long as that religious expression does not create a potential order or security problem. *Id.* at page 3.

He completed a medical questionnaire at the time of intake and indicated he had no health problems. *Defts' Ex.* 2 at page 1. His personal property was inventoried at the time of intake. *Id.* at page 4. He had no religious books or items on him at the time of intake. *Id.* On August 29, 2006, he was arrested for rape and served with a warrant. *Defts' Ex.* 1 at page 5.

On February 14, 2007, Sgt. Echols reported that the inmates' doors were opened at 0600 or 6:00 a.m. for the inmates to clean their cells and day-room. *Defts' Ex.* 4 at pages 2-5. Their cells were to be closed if they were not cleaning. *Id.*

At about 0630 or 6:30 a.m., Echols noticed there were four cells in D-150, three cells in D-149, and one cell in D-154 that were unlocked and slightly open. *Defts' Ex.* 4 at page 3. Echols called into the pod and announced that anyone caught in their cells not cleaning would be locked down. *Id.* No one exited the open cells in any of the pods. *Id.*

Deputy Carlton was assigned to D-pod. *Defts' Ex.* 4 at page 3. He was ordered by Echols to enter D-150 and shut the doors of the inmates who were still in their cells and not cleaning. Carlton went to the top tier and closed cell 226 with Inmate Juan Camacho in it. *Id.* Echols shut

cell 133 with David Yates and John Smallwood in it. *Id.* Yates was sitting on his bunk and Smallwood was writing a letter. *Id.*

Echols next locked inmate Carlos Vega in his cell. *Defts' Ex.* 4 at page 3. Vega was on his bunk in cell 134. *Id.* Echols next shut cell 139 with David Hernandez-Estrada because he was not cleaning. *Id.* Echols then exited the pod. *Id.*

They went to D-149 and Carlton went to the top tier. *Defts' Ex.* 4 at page 4. Inmate Robert Mix was in cell 232 and was not cleaning. *Id.* Mix told Carlton cell 232 was not his cell that he was housed in cell 230. *Id.* Mix was ordered back to his cell and to close the door. *Id.*

Inmate Thatcher was also in cell 232. *Defts' Ex.* 4 at page 4. He was housed in cell 236. *Id.* Thatcher was also ordered to go to his cell and shut his door. *Id.* Blount was in cell 232. *Id.* His door was shut because Blount was not cleaning. *Id.* All three inmates Mix, Thatcher, and Blount had been standing around talking to each other when they were separated and locked down. *Id.*

Echols and Carlton went to D-154 and to cell 170 because it was the only cell door still open. *Defts' Ex.* 4 at page 4. Inmate Chuck Howell was lying on the top bunk. *Id.* Echols shut his door and exited the pod. *Id.*

Carlton and Echols entered D-150 to pull the mats of the inmates being locked down. *Defts' Ex.* 4 at page 4. Inmate Hernandez-Estrada approached Echols. *Id.* When he was told to go stand by his cell door he refused. *Id.* Echols took him by the right arm and escorted him to the cell door. *Id.* Carlton allowed the inmates to gather their personal belongings from their cells and escorted them to E-103 for lock-down. *Id.*

-3-

Echols and Carlton then went back to D-149 to pull the inmates' mats that were being locked down. *Plaintiff's Resp.* at ¶ 16 (hereinafter *Resp.*); *Defts' Ex.* 4 at page 4. The mats, sheets, blankets, towels, and books were being removed from the inmates' cells. *Id.*

According to Carlton and Echols, they took Blount's mat, sheet, blanket, and books. *Defts' Ex.* 4 at page 2. Carlton states he picked up Blount's Bible to search it for contraband. *Id.* When he did, Carlton asserts Blount began to yell at Echols and Carlton and threaten them with a lawsuit if they took his Bible or Book of Mormon. *Id.* Echols told Blount repeatedly to calm down. *Defts' Ex.* 4 at pages 2 & 4. She stated she would check to see if Blount could keep both books. *Id.* Blount was cursing and yelling. *Defts' Ex.* 4 at page 4. Echols told Blount to calm down and put his mat outside his door. *Id.* He refused her order. *Id.*

Carlton took a hold of Blount's left arm and told him to cooperate. *Defts' Ex.* 4 at page 4. Echols told Blount she did not believe he could keep both books but that she would check with command staff when they arrived. *Id.* Blount was ordered to drop to his knees and keep his hands on the wall. *Id.* Echols had to remind Blount to keep his hands on the wall multiple times. *Id.*

On one occasion, Blount removed his hands from the wall and turned to face Echols. *Defts' Ex.* 4 at page 4. She attempted to gain control of Blount's right arm and was unsuccessful. *Id.* She administered pressure to his right mandibular angle pressure point in an attempt to receive compliance. *Id.* Blount continued to yell and curse at Echols. *Id.*

Echols told Blount that he could have both books until she heard otherwise. *Defts' Ex.* 4 at page 4. Echols explained that lock-down inmates are allowed one religious book. *Id.*

Echols then exited the cell. *Id.* Once Echols exited the cell Blount called her a "fat b----." *Id.* He stated she was going to "get it." *Id.*

Blount reminded Echols that he had a pending lawsuit against the jail. *Resp.* at ¶ 29; *Defts' Ex.* 4 at page 4. Echols stated he was still expected to follow the rules. *Defts' Ex.* 4 at page 4.

According to Blount, Carlton and Echols were taking the Bible and Book of Mormon from his cell and he told them he could have both. *Resp.* at ¶ 17. He states he was told he had to choose. *Id.* at ¶ 17 & ¶ 18. He "said no and if they were to ask the supervisors they would tell them it was o.k. for me to have both." *Id.* at ¶ 17.

Blount also maintains he was on the floor with his face towards the wall because he had pointed towards his paperwork about religious rights. *Resp.* at ¶ 19. He indicates he had not had the opportunity to respond to her orders. *Id.*

Blount maintains Carlton yanked, bent, and twisted his arm because he pointed towards his paperwork. *Resp.* at ¶ 20. He maintains he was grabbed and slammed by Carlton and then kneed in the back by Echols for stating his rights. *Id.* at ¶ 21. He asserts he tried to keep his face from hitting the wall and was punished for protecting himself. *Id.* at ¶ 22.

Blount denies yelling or cursing at Echols, calling her any names, or threatening her. *Resp.* at ¶ 23, ¶ 27 & ¶ 28. He states he did continually tell Echols she was violating his religious rights and reminding her he had a pending lawsuit against the jail. *Id.* at ¶ 24 & ¶ 29.

Lt. Carter arrived at the jail. *Defts' Ex.* 4 at page 4; *Resp.* at ¶ 33(without knowledge to agree or disagree). Echols asked him whether Blount could keep both the Book of Mormon and

-5-

a Holy Bible. *Defts' Ex.* 4 at page 4. Carter said Blount would have to choose between the two books. *Id.* Blount maintains this is not a choice. *Resp.* at ¶ 34.

Echols and Carlton came back to Blount's cell and told him to choose either the Bible or the Book of Mormon because Lt. Carter said he could only keep one. *Resp.* at ¶ 34. Blount refused. *Id.* Echols ordered Blount multiple times to choose because he could only keep one. *Id.* at ¶ 35. He refused and said he would file a lawsuit. *Id.* Echols removed the Bible due to the fact that Blount had previously complained he had been denied his Book of Mormon. *Id.* at ¶ 36. Echols and Carlton left Blount's cell without further incident. *Id.* at ¶ 37.

On February 14, 2007, Blount submitted a grievance stating he had been kicked in the back by the jail staff. *Defts' Ex.* 3 at page 1. He said it was wrong for them to put him on lock-down for praying in his cell with his Book of Mormon and Bible. *Id.* He said Sgt. Echols and Deputy Carlton came into his cell and took his Bible telling him that they didn't care about his religious rights or religion. *Id.* In response, on February 15th, Captain Petray wrote that he had talked to Blount yesterday concerning his Bible and he had not said anything about being kicked at that time. *Id.* However, he said he would look into Blount's complaint. *Id.*

Blount maintains his public defender, Mrs. McKinney, was present when he talked to Captain Petray. *Resp.* at ¶ 38. Blount states he told Captain Petray exactly what happened. *Id.*

Blount submitted a second grievance/request on February 14th in which he listed the nature of the complaint as "bruising-swelling." *Resp.* at ¶ 39; *Defts' Ex.* 3 at page 2. He stated he had notified the doctor there that he needed pictures taken of Sgt. Echols and Deputy Carlton's malicious acts of abuse against him. *Id.* He stated he had bruises on his face, back, and arms and needed pictures taken immediately. *Id.* In response, on February 15th, Captain Petray wrote

that he would have the sergeant check on this for Blount. *Id.* Blount also maintains Captain Petray saw the bruises and said he would check into this for him. *Id.*

On February 15th Captain Petray asked Sgt. Sharp to check into Blount's allegations that he had been beaten up by Sgt. Echols and Deputy Carlton and had bruises on his face, arms and back. *Defts' Ex.* 4 at page 1; *Resp.* at ¶ 40 (without knowledge to agree or disagree). Sgt. Sharp went to D-pod on February 17th and had Corporal Bryson call Blount out of D-149. *Resp.* at ¶ 41. When Blount arrived in pod control, Sharp asked Blount to show him the bruises. *Id.* Blount showed Sharp an area around his right eye. *Id.* Blount maintains it was dark. *Id.* He states he asked Sharp to take him to booking and his request was refused. *Id.*

According to Sharp, he saw no visible marks around Blount's eye. *Defts' Ex.* 4 at page 1. Sharp also looked at both Blount's arms and his back. *Id.* Sharp saw no indication of any scratches or bruising. *Id.* However, according to Blount, Sharp stated it was minor and he would take pictures. *Resp.* at ¶ 42(a). Blount was seen by the doctor on February 14th and treated for a rash with benadryl. *Id.* at ¶ 42(b).

Blount was charged with refusing to obey the order of a deputy as a result of his conduct on February 14th. *Resp.* at ¶ 43(a). He was found guilty and given ten days lock-down and loss of privileges. *Id.* at ¶ 43(b). He appealed and the decision was affirmed. *Id.* at ¶ 43(c).

Lt. Carter performed the duties of lock-down appeal on February 16th. *Resp.* at ¶ 43(d). He interviewed Blount. *Id.* According to Blount, he told Carter about his religious rights and the choice he had been given. *Id.* Carter recalled that Echols advised him that Blount had been placed on disciplinary status and was requesting to keep a Bible and Book of Mormon. *Id.* at ¶ 43(e). Carter advised Echols to have Blount choose which of the two books he wanted to keep.

*Id.*[1]

Blount told Carter that Carlton and Echols came back to his cell and ordered him to the back of the cell. *Resp.* at ¶ 43(f). Blount indicated all he wanted was his Bible. *Id.* Echols responded that he could have one religious book while on disciplinary lockdown. *Id.*

Blount told Echols he wanted both a Bible and Book of Mormon. *Resp.* at ¶ 43(g). Blount told Carter that when he raised his arm and pointed at the books Carlton grabbed his arm and placed him against the wall and Echols pinned his head against the wall and told him to face the wall. *Id.* Blount denied having called Echols any names. *Id.* at ¶ 43(h). Blount asserts he went two and one half weeks without having both the Bible and the Book of Mormon. *Id.* at ¶ 43(i).

Blount maintains Echols used excessive force against him. *Resp.* at ¶ 44. Specifically, he maintains she kneed him in the back while his knees were on the ground. *Id.* He states he was facing the wall with his hands on the wall. *Id.* As a result of her actions, he states his back hurts occasionally and his left shoulder rotator cup was injured. *Id.*

Blount also maintains Carlton used excessive force against him. *Resp.* at ¶ 45. Specifically, he maintains his left arm was yanked, bent, twisted, and then turned up at an angle behind his back when he was slammed against the wall. *Id.* As a result of Carlton's actions, Blount maintains his rotator cup was injured.

---

[1] Defendants indicate that as part of the appeal process Carter interviewed two inmates Mitchell and Fuller. Mitchell reportedly heard the deputies instruct Blount to be quiet and that he would be locked down for not coming out of his cell when instructed. Mitchell did not witness the officers strike Blount. Mitchell also heard the officers tell Blount he would only get to keep one religious book. Although defendants indicate Carter's report of these interviews are contained within their supplemental exhibit 4 (Doc. 17), it is not contained within the supplement to exhibit 4 or the original exhibit 4.

AO72A
(Rev. 8/82)

Blount requested a copy of his medical records on February 26th and also requested cream for his feet. *Resp.* at ¶ 46(a). He received cortisone cream. *Id.* at ¶ 46(b).

On March 8th, Blount requested that his personal property be released. *Resp.* at ¶ 47. He was told someone needed to come up and get his property. *Id.*

On March 10th, Blount submitted a request stating his cell-mate Robert Mix was close to trial and had talked about suicide. *Resp.* at ¶ 48. In response, Echols stated she would look into the matter. *Id.*

On March 18th, Deputy Grant reported that another inmate said the inmates in D-149, Cell 232 were keeping medication in a legal envelope. *Resp.* at ¶ 49. Deputies Villalpando and Grant searched the cell and found green capsules in a legal envelope belonging to Blount. *Id.* He was locked down for storing medication. *Id.* at ¶ 50.

On March 18th, Blount received a disciplinary hearing on the storing or hoarding medication charge and received ten days lock-down and loss of privileges. *Resp.* at ¶ 51. Blount said the medication was not his but the disciplinary finding was upheld on appeal. *Id.* at ¶ 52. In fact, he claims the medication belonged to Robert Mix. *Id.*

On March 20th, Blount submitted a request stating that he had letters to be placed in his personal property. *Resp.* at ¶ 53. In response he was told to put them in an envelope and write personal property on the envelope and give them to a pod deputy. *Id.*

On March 30th, Blount complained of ear pain and were to see the doctor. *Resp.* at ¶ 54. On April 6th, he was given the opportunity to see the doctor but refused doctor call. *Id.* at ¶ 55. Blount was released from the BCDC on May 2nd. *Resp.* at ¶ 56.

AO72A
(Rev. 8/82)

According to Blount, he submitted a grievance about being denied access to a copy of the Pearl of Great Price and the Doctrine and Covenants. *Resp.* at ¶ 57. He asserts he submitted the grievance on or about March 22nd but never received a response back. *Id.* He states he submitted the grievance at the recommendation of the Bishop of his Church. *Id.*

He also maintains he submitted grievances about being denied access to the Book of Mormon. *Resp.* at ¶ 58. He indicates he received these as far back as September 21, 2006. *Id.* He indicates he received varies responses such from Captain Petray and Lt. Carter such as: "I'll check into this matter" or "Talk to the sgt. on duty." *Id.* Blount states some of the grievances were not answered or returned. *Id.*

Blount denies that he was able to worship and follow the dictates of his religion while incarcerated at the BCDC. *Resp.* at ¶ 59. He states how could he worship if he was not allowed access to his religious materials but instead given a choice on how to worship and what to worship. *Id.*

Blount was asked to explain in detail how Lt. Carter violated his constitutional rights. *Resp.* at ¶ 60. He responded:

> Lt. Carter violated my rights by making me choose between two compatable religious books that are a soul part of my religious beliefs and activities. He went against the rules set forth, for the inmates rights handbook guidelines on religious constitutional rights. He stated this in his statement, he states this in exhibits. Echols also said she was told to follow the directions given to her by Lt. Carter.

*Id.*

Blount was asked to explain in detail how Captain Petray violated his constitutional rights. *Resp.* at ¶ 61. He responded:

> The jail rules are to be upheld by CPT. Petray in this area of his job he failed. I followed all rules as set forth by Jail commander on religious worship and its

AO72A
(Rev. 8/82)

rights. The county judge Div. II Judge Clinger know about violations. I filled out grievances, notified attorney, CPT. Petray did not uphold his jail policy, its rules, or federal guidelines mandated by the government. I was ignored, my voice unheard, my beliefs unrecognized, disrespected because I was an inmate and not treated equally or fairly with the law. How was worship of the Mormon religion a hazard, problem for the jail? I grieved, unanswered, answers I have been given.

*Id.*

While Blount could pray, he states he could not remember the Bible or Book of Mormon verse for verse. *Resp.* at ¶ 62. Not being able to read the Bible or Book of Mormon he maintains denied him "worship for answers to my questions on being denied, ridiculed, attacked." *Id.*

### **Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

"A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## **Discussion**

Defendants have now moved for summary judgment. First, they contend there is no proof that excessive force was used against Blount. They maintain Carlton and Echols used only the amount of force necessary under the circumstances facing them. They further point out that despite Blount's vague allegations of injuries there is no indication he suffered any injuries as a result of the application of force. Second, defendants maintain they did not interfere with Blount's right to exercise his religion. For the short time he was on lock-down, defendants indicate Blount was limited to one religious book. When Blount refused to choose between his Bible and the Book of Mormon, Echols choose the Book of Mormon since Blount had previously claimed he was denied access to it. Finally, defendants maintain asking Blount questions was a reasonable method of intra-jail communication and does not rise to the level of a constitutional violation.

### *Excessive Force*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, defendants indicate Blount was a pretrial detainee when the alleged excessive force occurred. *Defendants' Brief* (Doc. 15) at page 1. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Blount concedes he was ordered to the back of his cell. *Resp.* at ¶ 43(a). He indicates he was told he could have one religious book on lock-down and told Echols he wanted two religious books–his Bible and Book of Mormon. *Id.* at ¶¶ 43(f) & 43(g). Blount states he

-13-

raised his arm and pointed towards his books and told the officers he could have both books and did not have to choose. *Id.* at ¶ 17, ¶ 19 & ¶ 43(g).

Blount also concedes he continually said Echols was violating his religious rights. *Resp.* at ¶ 24. He agrees he was told multiple times he had to choose. *Id.* at ¶ 35. He refused. *Id.*

When Blount submitted a grievance he complained of bruising and swelling on his face, back, and arms. *Resp.* at ¶ 39. He made no mention of any injury to his shoulder. *Id.* Sharp examined Blount two days later and observed no bruising or scratches. *Id.* at ¶ 42(a).

Blount's lack of any visible injury just two days after the incident as well as his failure to seek medical treatment for any injuries, belies his statements regarding the amount of force used during the incident. Moreover, given his failure to obey the orders of the deputies, application of some force was reasonable. Blount indicates Carlton grabbed his arm and placed him against the wall and Echols pinned his head against the wall and told him to face the wall. *Resp.* at ¶ 43(g). We do not believe there are any genuine issues of fact as to whether defendants used excessive force against Blount.

### *Religious Freedom*

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987). *See also Cruz v. Beto*, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972).

This right, however, is not without limitation. The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *O'Lone*, 482 U.S. at 348. "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'" *Murphy v. Carroll*, 202 F. Supp. 2d 421, 424 (D. Md. 2002)*(quoting Turner*, 482 U.S. at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Cruz*, 405 U.S. at 322). *See also Thomas v. Gunter*, 32 F.3d 1258, 1259-60 (8th Cir. 1994). "A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004).

In analyzing a First Amendment free exercise claim, the court first addresses the "threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then app[ies] the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004). "Prison regulations that infringe on the constitutional rights of prisoners are judged by their reasonableness. Prison officials are not required to choose the least restrictive means possible in furthering administrative interests." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990).

In *Turner v. Safely*, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), the Court set forth a reasonableness test consisting of four factors used to balance an inmate's free exercise right and the prison's legitimate correctional goals and security concerns. Specifically,

the court considers: (1) whether there exists a rational connection between the prison policy or regulation and a legitimate governmental interest advanced as its justification; (2) whether there are alternative means of exercising the right notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether there are ready, easy-to-implement alternatives that would accommodate the prisoner's rights. *Turner*, 482 U.S. at 89-91.

In this case, Blount's claim centers on his confinement to disciplinary lock-down for ten days following the incident on February 14, 2007. *Resp.* at ¶ 43(a) & ¶ 43(b). Jail rules allowed inmates on disciplinary lock-down to only have one religious text. *Defts' Ex.* 4 at pages 2 & 4; *Resp.* at ¶ 43(f). Blount's Bible was removed and he was allowed to keep his Book of Mormon. *Resp.* at ¶ 36. Blount was given multiple opportunities to choose between the two religious texts but refused. *Id.* at ¶ 35. Once he was off lock-down Blount received his Bible back. *Id.* at ¶ 43(i).

Blount also maintains that throughout his incarceration he was denied access to a copy of the Pearl of Great Price[2] and the Doctrine and Covenants.[3] *Resp.* at ¶ 57. He maintains under penalty of perjury that he did submit grievances regarding not being allowed access to these documents but never received responses. *Id.*

---

[2] According to the official website for the Church of Jesus Christ of Latter-day Saints, the Pearl of Great Price is one of the volumes of scripture included in the standard works of the Church. It includes "extracts from Joseph Smith's Translation of the Bible as well as a translation of some Egyptian papyri containing the writings of the prophet Abraham, excerpts from Joseph Smith's testimony and history, and the Articles of Faith of The Church os Jesus Christ of Latter-day Saints." www.mormon.org/mormonorg/eng/basic-beliefs/glossary (September 3, 2008).

[3] According to the official website for the Church of Jesus Christ of Latter-day Saints, the Doctrine and Covenants is one of the volumes of scripture included in the standard works of the Church. It is a "collection of modern-day revelations and inspired declarations given by God to the Church through the Prophet Joseph Smith and other latter-day Presidents of the Church." www.mormon.org/mormonorg/eng/basic-beliefs/glossary (September 3, 2008).

AO72A
(Rev. 8/82)

Captain Petray asserts the jail records do not contain any grievances regarding Blount being denied access to his Book of Mormon or the Pearl of Great Price and the Doctrine and Covenants. However, with regard to the Book or Mormon, Echols stated in her incident report dated February 14, 2007, that she removed the Bible[4] from Blount's cell because he had previously complained about being denied his Book of Mormon. *Defts' Ex.* 4 at page 4. Additionally, on October 23, 2006, Blount filed a lawsuit against Captain Petray and others at the BCDC, contending, *inter alia*, that he had been denied access to his Book of Mormon. *Blount v. Petray, et al,* Civil No. 06-5207. He attached to his complaint in that case a grievance in which he stated two guards had temporarily taken his Book of Mormon in September of 2006. It is therefore clear Blount at least submitted one grievance relating to the Book of Mormon being removed from his cell. Captain Petray's search of Blount's records apparently failed to reveal this grievance despite the fact that it was the subject, or one of the subjects, of a prior lawsuit filed by Blount. We cannot say on the record before us that Blount failed to exhaust his administrative remedies.

With respect to the BCDC's policy of allowing detainees to have only one religious book while on disciplinary lock-down, the court must deny defendants' summary judgment motion. The court simply has insufficient information regarding this policy to perform the required analysis under *Turner*. Under *Turner*, regulations reasonably related to legitimate penological interests generally pass constitutional muster. *See Turner*, 482 U.S. at 84. *See also O'Lone v. Shabazz*, 482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987). However, to make this

---

[4] Blount submitted a grievance about the Bible being removed from his cell on February 14, 2007.

-17-

determination, as noted above, the court must weigh four factors. In this case, the court is advised of the existence of this policy but not given the reasons for its adoption, the consequences of accommodating the inmates on the guards, or other inmates, etc.

*Retaliation*

In order to prevail on a First Amendment retaliation claim, Blount must establish that: "he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [him] that would chill a person of ordinary firmness from engaging in that activity." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007)(*citing Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir.2004), *cert. denied,* 546 U.S. 860, 126 S. Ct. 371, 163 L. Ed. 2d 140 (2005)). "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Lewis*, 486 F.3d at 1029 (citations omitted).

Courts have recognized that prisoners will inevitability take exception to the decisions and that claims of retaliation may readily be fabricated. For this reason, it has been noted that claims of retaliation are to be examined with skepticism and care. *See e.g., Flaherty v. Coughlin*, 713 F.2d 10 (2d Cir. 1983). In this case, I believe there are no genuine issues of material fact as to whether defendants retaliated against Blount.

In connection with his conduct on February 14th, Blount was charged with a disciplinary violation, found guilty, and given ten days lock-down. *See Resp.* at ¶ 43(b). He appealed the disciplinary conviction. *Id.* at ¶ 43(c). He continued to submit grievances and/or requests on various topics and medical requests. *See e.g., id.* at ¶¶ 46(a), 47, 48, 53. The only subsequent time Blount was disciplined he received a disciplinary hearing and was found guilty and was given an opportunity to appeal the finding. *See e.g., Resp.* at ¶¶ 51 & ¶ 52.

-18-

He initiated two lawsuits while incarcerated at the BCDC and represented himself. Blount was not denied access to the mail, writing paper, or access to the courts. There is nothing in the record to show Blount lost a specific claim in any legal proceeding as a result of the jail's alleged interference. *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). The defendants are entitled to summary judgment on this claim.

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 14) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to Blount's excessive force and retaliation claims. I further recommend the motion be denied with respect to Blount's claim that his religious rights under Free Exercise Clause of the First Amendment were violated.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of September 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)