IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHRISTOPHER DON BLOUNT                                                                      PLAINTIFF

v.                          Civil No. 07-5046

SGT. ECHOLS; PVT. CARLTON;
LT. CARTER; and CAPTAIN
HUNTER PETRAY, all of the
Benton County Detention Center                                             DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*. While incarcerated at the Benton County Detention Center, plaintiff contended excessive force was used against him, he was retaliated against, and his religious rights were violated. Defendants were granted summary judgment on plaintiff's excessive force and retaliation claims (Doc. 23). On February 19, 2009, an evidentiary hearing was held on plaintiff's claim that his religious rights under the Free Exercise Clause of the First Amendment were violated. At the conclusion of the hearing, the case was taken under advisement pending preparation of this report and recommendation.

**Background & Evidence Presented**

At the evidentiary hearing, the court heard the testimony of the following witnesses: (1) Chris Drosopoulos; (2) Tim Thatcher; (3) Sgt. Megan Vanatta (formerly Echols); (4) Lt. Paul Carter; (5) Sgt. Dustin Carlton; (6) Robert Mix; (7) Augustin Salas-Realzola; (8) Captain Hunter Petray; and (9) Christopher Blount. For purposes of discussion, the court will summarize in the

first person the testimony given at the evidentiary hearing. For ease of discussion, the testimony will not necessarily be summarized in the order given.

### *Chris Drosopoulos*

I'm currently incarcerated at the Federal Correctional Institute in Texarkana, Texas. I was in the Benton County Detention Center (BCDC) for about six months from August of 2006 until November of 2006. I then went to Fort Smith for one month and back to the BCDC in December.

Blount was a Mormon. I saw deputies remove his Book of Mormon at least once. One time they took his books. He kept asking for his Book of Mormon back. He kept turning in requests asking about. They told him something like he couldn't be Christian and Mormon.

It stuck with me because of the taking of the Book of Mormon. I believe it was the lady who is seated there in the courtroom (indicating defendant Echols). She was a sergeant at the time. I don't know why he was in trouble. He was going to be put on lock-down. When you are put on lock-down, the only thing they leave you is your Bible–sometimes not even that. They were taking everything out of his cell.

I got locked down for doing push-ups. They take everything you have and leave you the Bible. This was on D-block.

They were pretty rough with him. He was pushed against the wall. There was yelling involved. There was no coming in and out. The doors were never open to the cell. I looked in to see what was going on with the guard out of curiosity. I don't recall them bringing the Book of Mormon or Bible back.

Blount was in trouble a few times. It didn't take much.

-2-

Last year I was called to court to testify for David Daniels. I have been convicted of a felony.

### Tim Thatcher

I'm currently incarcerated in the Arkansas Department of Correction (ADC) in the Ouachita River Correctional Unit. On February 14, 2007, I was in Blount's cell. I heard them say it was time to get out of the cells. In less than a minute they came upstairs. I was outside the cell. Blount was in the cell with Mix.

I believe Blount was in the cell praying. No one was praying out loud on this particular day. I want to say Mix was also in the cell but I could be wrong.

Guards went in. I was pushed back in the cell. I was told to catch the wall. The guards started going through our stuff, doing a shake down, and then we were told we were going to be on lock-down. We were against the wall. The guards took Blount's Book of Mormon or Bible and told him that he couldn't have two religious books at the same time.

I didn't see any hostile acts by Blount. I believe Carlton was there too. He pushed me back into the cell. They removed mats, blankets, and towels. They told Blount that he had to pick between the Book of Mormon and the Bible. Echols called Blount "Mormon Boy" and told him that he had to pick between the two. She said he couldn't have both books.

When you go on lock-down, they take everything. You are not allowed to have any library book. You are only allowed to have one religious book.

I know they came in and took them. They brought the books back and said he could choose. Blount said he couldn't choose. He said he couldn't choose that he needed both. He told them the Book of Mormon and the Bible went together; they went hand and hand with his religion.

He said he had to have them together and couldn't choose. Echols was telling him to choose. Blount said do some sit ups. The two started arguing. I didn't hear him call her the "B" word. Echols kicked him. They left.

An hour or two later, Echols told Blount the lieutenant said he could choose. Blount still said he couldn't choose. When he wouldn't choose, they were both taken. Blount didn't have the Bible or the Book of Mormon with him during the four days I was on lock-down with him.

I do not recall them giving the Book of Mormon back to him. Had Blount asked, I would have loaned him my Bible. He didn't ask me to read my Bible. Blount did make several requests for both. He never asked for just one. He said he needed one for reference and one for reading.

He was locked down for being in the cell–disobeying an order and given ten days lock-down. I was in jail six months that time–November to May.

I'm a Christian. I was allowed to have my Bible. I had to get it out of my cell. I had a Bible while I was on lock-down.

When the officers arrived in the pod, Blount was still in the cell. I had heard one minute or less before that the officers said get out of the cells.

Blount presented some problems. Other inmates had some problems with him.

I am housed in the same ADC unit as Blount. I knew I was coming here today. I didn't discuss my testimony with him. I'm in general population now. In the BCDC I was in D-149 and that was protective custody.

### Sergeant Megan Vanatta (formerly Echols)

I worked for the Benton County Sheriff's Office on February 14, 2007. At the time of the incident, my last name was Echols.

-4-

After breakfast the inmates are given time to clean their cells and the day-room. The cells are open for cleaning not sleeping. If they are not cleaning their cells, they are to close their cells. They are given a warning, the cells are shut, and items are removed. I announced several times for the inmates to come out of their cells and shut the doors. There were multiple pods involved. I closed the cell doors in D-149. We shut the doors first and then went back and began removing the mats, sheets, and blankets.

Blount was ordered to remove his mat. We were shaking down his cell. Blount became physically and verbally defiant. As soon as we came in, he began yelling about his Book of Mormon and Bible. Up to this point, I had never dealt with an inmate who asked to keep a Book of Mormon and a Bible. I consulted with Lt. Carter. According to the policy, while on lock-down, an inmate is allowed to keep only one religious book. Blount refused to choose between the two books.

I allowed him to keep the Book of Mormon. I was unaware of the practice of his religion but was aware of the fact that he had previously filed a lawsuit stating he had been denied his Book of Mormon. *See e.g., Plaintiff's Exhibit* 8 at page 2. Both religious books were never removed from Blount's cell. Blount could have traded the Book of Mormon in for the Bible the next day.

The pod Blount was in had sixteen cells. Eight of the cells were located on the top tier and eight on the bottom tier. I looked in pod control to see what doors were open and closed. I noted down what cells were in violation. Blount's cell was on the left upstairs. His cell would have been one of the first cells upstairs that we would have dealt with.

Everything is removed from the cell when an inmate is put on lock-down, mattresses etc. Initially Blount was allowed to keep both his Book of Mormon and his Bible. We continued with pulling mattresses and conducting the shake down. About an hour later I was able to get with the lieutenant. I then went back and told Blount he had to choose. Blount refused. I told him multiple times to pick. He wouldn't. I left him the Book of Mormon because he had filed a lawsuit over it.

I worked in the jail for five and one-half years. I don't know if it is a written policy that inmates can only have one religious book on lock-down. Before this, it was never questioned why an inmate could only have one religious book. If an inmate has a sheet of paper from a minister such as devotional worksheet, he can keep that. It is common for an inmate to ask for a Bible. A trustee can go get it.

There is a book cart with religious materials that comes once a week. It is up to the ministers whether or not they want to see lock-down inmates. They have to see them separately.

Our policy is that we cannot stack lock-down charges so Blount was not charged with having cursed me even though he did. *See Plaintiff's Exhibit* 8 at page 2 ("Once I was outside the door Inmate Blount told me I was a 'fat b----.'").

When an inmate is booked in, one of the questions he is asked is his religion. The inmate's response to the question is entered into the computer. Blount indicted he was nondenominational. *See e.g., Plaintiff's Exhibit* 8 at page 3 (referencing booking information from August 17, 2006). However, when a booking report is printed, *see e.g., Plaintiff's Exhibit* 13, this is one of the fields of information that does not print out.

-6-

*Lt. Paul Carter*

I'm a lieutenant commander at the BCDC. I was employed in this capacity in February of 2007.

At the time, the booking report system we used had a field to list the inmate's preference of religion. The field appeared on the screen and was completed by the booking officer but it does not print as part of the booking report. It was this way in 2006 and 2007.

Inmates on lock-down are allowed to choose a religious book and to re-circulate it at the time of choosing. This is not a written policy. It was our procedure. He could have had both books as long as it had been approved by the Captain or someone.

I was not aware of the fact that Blount was Mormon at that time. I'm not familiar with Pearl of Great Price or the Doctrine and Covenants and whether they qualify as religious books. I would have to do research on that or consult with clergy. If an individual makes a sincere request to have more than one religious book, the request would be evaluated on an individual basis. There is no procedure or protocol for determining who is sincere. It is really just done on an individual basis from an individual perspective. The decision was left to Blount as to which book he wanted while he was on lock-down.

I was not aware of the fact that Blount had sued previously because he didn't have the Book of Mormon. Worksheets are not in book form and inmates are allowed to keep those. I'm not familiar with the Mormon religion. However, the rule applied for every inmate. They are free to choose the religious book. I instructed the sergeant to allow Blount to make the choice of which religious book he wanted.

AO72A
(Rev. 8/82)

Inmates are advised of a disciplinary infraction, their belongings are removed, they are allowed to keep a religious book of their choosing. A hearing is held and an appeal process exists. Blount's appeal process was done on February 16th. *Defendants' Exhibit* 6. There were no jail ministers there. I conducted an interview with Blount. *Id.* When the order was given to vacate the cells the inmates must do so and come into the day area. I interviewed five other inmates. *Id.* It is my understanding that shortly after the incident, Blount received both books back.

Blount had numerous disciplinary actions against him while at the BCDC. In this instance, he refused to choose so he just had his Book of Mormon. Shortly thereafter, his Bible was brought back to him. Initially his Book of Mormon was left and his Bible was taken. Sometime later, his Bible was returned to him and he had both books. Inmates are allowed to trade religious books for another one at anytime.

### Sergeant Dustin Carlton

I'm a sergeant at the BCDC. I worked there in February of 2007.

When I entered the pod on February 14, 2007, Blount was in his cell. I didn't see him go upstairs. When we first came into the pod, we shut the cell doors. After we shut the cell doors, then I came back and started helping with the removal of items. We took the mats, bed rolls, towels.

Blount became irate and uncooperative with Echols. It was Blount, another inmate, and one coming out. She told them to get back in. I put a hand on his chest and directed him back in. At one point, Echols applied pressure to Blount's mandibular to gain his compliance. I was on his left at the time.

-8-

Initially both the Book of Mormon and the Bible were left in the cell until Echols could talk to Carter. Echols got confirmation from Carter that Blount could only have one and to have him choose which one.

I didn't carry on the conversation with Carter—Echols did. It is my understanding from my supervisors, that inmates are allowed only one religious book while on lock-down.

There was probably an hour between when we initially left both books in the cell and when we returned and Blount was told he would have to choose which religious book he wanted. When he was asked to choose which book he wanted, he refused. The Bible was taken. I don't recall him filling out a grievance on February 14th about his Bible being taken. I don't know when his Bible was returned.

### Robert Mix

I'm currently incarcerated in the ADC, Cummins Unit. In February of 2007 I was incarcerated in the BCDC.

I believe I was in the day-room when the guards came in and started locking people down. I saw the guards take religious materials from Blount. The cell Blount was in was in the top tier. I was looking up to the top tier. I couldn't see what was going on inside the cell but I saw things coming out of the cell. I saw books come flying out.

It was known in the pod that Blount was a Mormon. I heard the guards order Blount to choose between the Book of Mormon and the Bible. They said he could only have one.

I remember Blount wanted his religious books. Blount said he was entitled to both.

They took both books. They came out with two books. I don't think he had either one. It was common for inmates to pray in the morning to have a good day.

I know Blount had problems keeping religious items. At least twice, he had items taken away. He was very sincere about keeping both the Book of Mormon and the Bible. I don't think he is a trouble maker.

### *Augustin Salas-Realzola*

I'm incarcerated in the ADC, Diagnostic Unit. I was incarcerated in the BCDC in February of 2007. I was in the BCDC for about two months.

I remember Echols went to Blount's room and kicked him. She dropped books, mattresses, sheets, blankets. At that time, I didn't understand much English.

### *Captain Hunter Petray*

I'm the jail administrator of the BCDC. I occupied that position in February of 2007.

I know that Blount on several prior occasions had requested a Spanish edition of the Book of Mormon. On February 14, 2007, Blount submitted a grievance regarding Echols having taken his Bible. *Plaintiff's Exhibit* 5. I vaguely remember seeing Blount in the booking area and him telling me they took his Bible. I believe Blount had seen his attorney. Blount only mentioned the Bible being taken. *Id.* I was operated under the assumption only his Bible was taken. *Id.*

The standard practice is that inmates in general population get one religious book and two library books. This is not a written policy–just the standard practice. We limit the number of books inmates have for safety and security reasons. It helps avoid plumbing problems and keeps inmates from hiding contraband in the books. If an inmate has more than three books, it is a violation of the rules.

When an inmate goes on lock-down, the library books are taken away and they also lose visitation rights and personal phone calls. The privileges of inmates are taken away because they

-10-

have violated the rules of the jail. The purpose is try to instill discipline in an effort to get obedience to officials. We allow one religious book because we feel that is a right. The inmates are permitted to trade the religious book for a different religious book essentially as many times as they choose. It has happened in the past. One religious book has always been our standard practice. We have to limit it somewhere. To my knowledge you can only read one book at a time.

I don't know if this is word for word, *see Plaintiff's Exhibit* 1 (no preference shall ever be given to any religious establishment or mode of worship), but we have something similar to this posted. If you are a Baptist, we won't say you have to be a Seventh Day Adventist, etc.

With respect to the booking report, a lot more information is entered into the computer than is printed out. The booking report that is printed is merely a synopsis of the information that is obtained when an individual is booked. Certain fields of information are not printed.

The booking information is verbally obtained. Religion is asked for a number of reasons one of which is dietary reasons. Employees of the jail use the booking information and access it via the computer.

When I looked online at Blount's booking screen, the information stored in the computer says non-denominational. I don't know how sincere that is. It is difficult to try to make a sound honest judgment as to whether it is sincere or not.

When I responded to Blount's February 14th grievance, I said I would look into his complaint. I sent Sgt. Sharp to look at him. He didn't see any evidence of bruising from where Blount contended he had been kicked. I talked to Blount up in booking. I could have talked to Lt. Carter.

*Defendants' Exhibit* 1 is our policy concerning religious services. *Defendants' Exhibit* 2 sets forth the inmate rights. The rights do not refer to the number of books an inmate may have. Blount did not have any religious books in his possession when he came into the jail. *Defendants' Exhibit* 3.

Sometime between February 15th and February 16th, I believe the lieutenant and I had talked and Blount had been given his Bible back. It was probably me that authorized the return of the Bible to him. It was possibly a change in policy to allow him to have it. But since he had already filed one lawsuit, I let him have it. At most, Blount was without his Bible for one day.

### Christopher Don Blount

I was booked into the BCDC on August 16, 2006. On February 14, 2007, I didn't hear them say to get our of our rooms. Thatcher said get out. I started taking my stuff. I started taking my Book of Mormon and Bible. I had already been very vocal about my rights.

I was told to grab the wall. I saw them go to take my Book of Mormon and Bible. They told me I was going to have to choose. They walked out with both of them.

They came back and told me I had to pick one. I refused. They took both.

I got them both back when I got off lock-down ten days later. The Book of Mormon and Bible are companions. They are not going to make me choose to have one or the other. Joseph Smith received revelations when he was fourteen and transcribed them into a companion to the Bible.

When I submitted my grievance on February 14th, *see Plaintiff's Exhibit* 5, I put Bible on there twice. I didn't put the words Book of Mormon on there. I'm saying now in fact they took my Book of Mormon too.

-12-

I sent this document dated February 14, 2007, to the court. *Plaintiff's Exhibit* 10. It only mentions my Bible being taken. *Id.* I wrote this asking if inmates witnessed Echols removing my Bible from my room. *Plaintiff's Exhibit* 11. It does not mention the Book of Mormon being removed. *Id.* I wrote this document which says Echols was told to take my Bible and leave the Book of Mormon. *Plaintiff's Exhibit* 12. However, my testimony today is both were taken for ten days.

I was asking sincerely to keep my religious belongings and got punished for it. I expect them to follow the rules. You get to a point where you want to throw up your hands because you know no matter what you will do it will be wrong.

I have memorized portions of the Bible and the Book of Mormon. I was able to pray and recite the portions I have memorized. I couldn't possibly remember everything in the Bible and Book of Mormon. If I had asked, I could have read the Bible of my roommate. I did use his Bible during the ten days. Thatcher didn't follow my same beliefs but we did pray together.

## Discussion

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987). *See also Cruz v. Beto*, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972).

AO72A
(Rev. 8/82)

This right, however, is not without limitation. The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *O'Lone*, 482 U.S. at 348. "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'" *Murphy v. Carroll*, 202 F. Supp. 2d 421, 424 (D. Md. 2002)*(quoting Turner*, 482 U.S. at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Cruz*, 405 U.S. at 322). *See also Thomas v. Gunter*, 32 F.3d 1258, 1259-60 (8th Cir. 1994). "A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004).

In analyzing a First Amendment free exercise claim, the court first addresses the "threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then app[ies] the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004). "Prison regulations that infringe on the constitutional rights of prisoners are judged by their reasonableness. Prison officials are not required to choose the least restrictive means possible in furthering administrative interests." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990).

In *Turner v. Safely*, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), the Court set forth a reasonableness test consisting of four factors used to balance an inmate's free exercise right and the prison's legitimate correctional goals and security concerns. Specifically, the court

considers: (1) whether there exists a rational connection between the prison policy or regulation and a legitimate governmental interest advanced as its justification; (2) whether there are alternative means of exercising the right notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether there are ready, easy-to-implement alternatives that would accommodate the prisoner's rights. *Turner*, 482 U.S. at 89-91.

In this case, Blount's claim centers on his confinement to disciplinary lock-down for ten days following the incident on February 14, 2007. Jail rules allowed inmates on disciplinary lock-down to only have one religious text. Although Blount testified at the hearing that both his Book of Mormon and Bible were removed, his testimony was not credible. His own documents including the grievance he submitted at the time this incident contradict this statement as well as his prior summary judgment response which was sworn to under penalty of perjury. *See Plaintiff's Exhibits* 5, 10, 11, 12; *Resp.* (Doc. 21) at ¶ 36. I conclude Blount's Bible was removed and he was allowed to keep his Book of Mormon. *Resp.* at ¶ 36.

The testimony was undisputed that Blount was given multiple opportunities to choose between the two religious texts but refused. Furthermore, the testimony was undisputed that Blount's cell-mate had a Bible within the cell during the time the two were on lock-down. Additionally, the cell-mate testified his Bible was available for Blount to use and Blount in fact testified he used the Bible. Thus, Blount had access to both religious texts during his lock-down period.

AO72A
(Rev. 8/82)

Furthermore, the testimony was uncontradicted that the practice of the detention center was to allow inmates on lock-down to change or switch out the religious texts they were using. Thus, at any time Blount could have asked for a Bible instead of the Book of Mormon or vice versa. There was no testimony suggesting there was any limitation put on the number of times an inmate could ask to change or switch out the religious text he had in his cell.

Clearly, the detention center has legitimate interests in enforcing the rules of the jail and ensuring compliance with jail rules. One of the recognized means of doing so is to restrict the privileges available to inmates. Given the availability of the opportunity to change out the religious text for another, the fact that in this case the cell contained both a Bible and Book of Mormon, and the limited period of time involved, we find no constitutional violation exists.

### Conclusion

For the reasons stated, I recommend judgment be entered in the defendants' favor and this case be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of March 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)